

OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

JOHN CORNYN

January 24, 2000

The Honorable Russell W. Malm
Midland County Attorney
200 West Wall Street, Suite 104
Midland, Texas 79701

Opinion No. JC-0170

Re: Whether an appropriation of general revenue funds to The University of Texas of the Permian Basin for the construction of a museum building is precluded by article VII, section 18(i) of the Texas Constitution (RQ-0114-JC)

Dear Mr. Malm:

You ask whether an appropriation of general revenue funds to The University of Texas of the Permian Basin ("UTPB") for the construction of a museum building is precluded by article VII, section 18(i) of the Texas Constitution. We conclude that it is. Section 18 authorizes The University of Texas System Board of Regents to issue bonds and notes to finance construction of buildings and other permanent improvements at UTPB and other University of Texas System campuses. *See* TEX. CONST. art. VII, § 18(b). *Subsection (i) of section 18 provides that The University of Texas System may not receive any general revenue funds for such construction projects, with two limited exceptions. See id.* § 18(i). Pursuant to one of those exceptions, the legislature may appropriate general revenue funds for this purpose if it does so "by two-thirds vote of each house [], in cases of demonstrated need, which need must be clearly expressed in the body of the act." *Id.* § 18(i)(2). Because the act appropriating funds for construction of the UTPB museum building does not express a need for the project as required by the exception to the article VII, section 18(i) limitation on appropriations, the appropriation is precluded by that limitation. Assuming the appropriation is valid and the building is constructed, you also ask about the legal standard for determining the rent a private museum must pay to use it. Given our answer to your first question, we do not address your second question.

Your questions arise from an appropriation in the 1999 General Appropriations Act (the "Appropriations Act" or "House Bill 1") to UTPB of $1.25 million in fiscal years 2000 and 2001 as "special item support" for a "presidential museum." House Bill 1, Act of May 26, 1999, 76th Leg., R.S., ch. 1589, III-78, 1999 Tex. Gen. Laws 5446, 5746. This appears to be an appropriation of general revenue funds. A rider following the appropriation to UTPB states as follows: "Funds appropriated above for the Presidential Museum are for the purpose of constructing a building to house the Presidential Museum on a leased portion of the University of Texas of the Permian Basin Campus. Funding for operations of the museum shall remain the responsibility of the Permian Basin

Museum Board." *Id.* III-79, at 5747. You ask whether this appropriation violates section 18(i) of article VII of the Texas Constitution.

Before examining section 18 in detail, we begin with a brief explanation of the historical background. The voters approved the amendment adding both sections 17 and 18 to article VII of the Texas Constitution in November, 1984. *See* Tex. H.R.J. Res. 19, 68th Leg., R.S., 1983 Tex. Gen. Laws 6701. Section 17 established the higher education assistance fund, providing a funding mechanism for institutions of higher education that are not included in the University of Texas or Texas A&M University systems. *See id.* at 6703. Section 18, the focus of your inquiry, restructured the Permanent University Fund to expand the number of University of Texas and Texas A&M University institutions eligible to use the Permanent University Fund for financing purposes. *See id.* at 6707. With respect to section 18, the amendment was intended to "increase bonding authority for both the UT and A&M systems" and to "expand the purposes for which bonds may be issued at the PUF schools." HOUSE COMM. ON HIGHER EDUCATION, BILL ANALYSIS, Tex. H.R.J. Res. 19, 68th Leg., R.S., at 3 (1983).

Significantly, the amendment also was intended to limit schools' access to general revenues, *see id.* ("the schools could not receive any other general-revenue appropriations for any of the purposes designated in the amendment, except for the purchase of capital equipment, library books, or library materials"), and to shift higher education funding decisions away from the legislature, *see id.* at 5 ("CSHJR 19 would take college construction funding decisions out of the political arena"). Supporters of the amendment argued that this change would make higher education funding more equitable and more efficient. *See id.* ("When schools rely on legislative appropriations for their building needs, the amount each school receives depends more on the clout of legislators from its district, and on the political pull of its governing board, than on the merits of the request. . . . The proposed amendment would put decisions about construction, repair, etc., in the hands of those most qualified to make them — the members of the governing board of each college. No group is better acquainted with a college's real needs."); *see also* TEXAS LEGISLATIVE COUNCIL, INFORMATION REPORT NO. 84-1, ANALYSES OF PROPOSED CONSTITUTIONAL AMENDMENTS, at 14 (1984) ("Constitutionally dedicated funds, allocated according to an equitable formula, provide for orderly, planned growth based on anticipated and actual need. The universities are not typical state agencies and are ill-suited to lobby for appropriations in competition with other state agencies. The few universities that have political 'muscle' will receive a disproportionate share of the funds allocated through the appropriations process.") (summary of arguments for amendment).

Section 18 authorizes the boards of regents of The Texas A&M University System and The University of Texas System (the "systems") to issue bonds and notes to finance construction of buildings and other permanent improvements for their component institutions, including UTPB. *See* TEX. CONST. art. VII, § 18(a), (b). The amount of bonds and notes each system is authorized to issue is tied to a percentage of the value of the Permanent University Fund, a preexisting fund established by the constitution to benefit the two systems. *See id.; see also id.* § 10 (establishing University of

Texas and Texas A&M University); §§ 11, 11a, 11b (establishing and governing Permanent University Fund). The Texas A&M University System is authorized to pledge all or any part of its one-third interest in the available university fund, *see id.* § 18(a), which consists of dividends, interest, and other income from the Permanent University Fund, *see id.* § 18(e) (defining "available university fund"); *see also id.* § 11a (directing interest, dividends, and other income from the Permanent University Fund to appropriation "by the operation of [article VII, section 18] for the payment of principal and interest on bonds or notes issued thereunder"). The University of Texas System is authorized to pledge all or any part of its two-thirds interest in the available university fund. *See id.* § 18(b).

Subsections (a) and (b) authorize the systems to issue bonds and notes for the system administrations and component institutions for the following purposes:

> acquiring land either with or without permanent improvements, constructing and equipping buildings or other permanent improvements, major repair and rehabilitation of buildings and other permanent improvements, acquiring capital equipment and library books and library materials, and refunding bonds or notes issued under this section or prior law.

*Id.* § 18(a), (b). Subsection (d) of section 18 provides that the proceeds of bonds or notes issued under subsections (a) or (b) may not be used to construct, equip, or repair auxiliary enterprises.

We understand from material submitted by The University of Texas System that the proposed museum building would not be an auxiliary enterprise within the meaning of subsection (d). *See* Memorandum from Florence P. Mayne, Attorney, Office of the General Counsel, The University of Texas System, to Mr. Ray Farabee, Vice Chancellor and General Counsel, The University of Texas System, at 4-6 (Nov. 18, 1999) (on file with Opinion Committee) [hereinafter "UT General Counsel Memo"]. We also understand that the museum building would be the property of UTPB and would not be owned by the State of Texas separate and apart from UTPB, as are some museums located on university campuses. *See id.* at 1-2; *see also* TEX. EDUC. CODE ANN. § 51.905 (Vernon 1996) (providing for governance of state-owned museum buildings located on campuses of senior colleges and authorizing senior college governing boards to administer expenditure of state funds appropriated for construction and operation of such museums). *Cf.* Tex. Att'y Gen. Op. No. C-395 (1965) (holding that legislative appropriation of general revenue funds to West Texas State University at Canyon for construction of Panhandle-Plains Museum did not violate former section 17 of article VII limitation on appropriations because museum was state-owned and constituted an entity separate and apart from the university). Thus, the museum building is a permanent improvement eligible for financing under subsection (b) of section 18. *See* UT General Counsel Memo at 4-6.

Subsection (i) of section 18 limits the authority of the legislature to appropriate general revenue funds for land acquisitions and permanent improvements that are eligible for financing under subsection (b):

> The state systems and institutions of higher education designated in this section may not receive any funds from the general revenue of the state for acquiring land with or without permanent improvements, for constructing or equipping buildings or other permanent improvements, or for major repair and rehabilitation of buildings or other permanent improvements.

TEX. CONST. art. VII, § 18(i). (Appropriations for capital equipment, library books, and library materials are not included within this limitation.) Subsection (i) is followed by two exceptions that permit the legislature to appropriate general revenue funds for subsection (b) projects in two types of extraordinary circumstances:

> (1) in the case of fire or natural disaster the legislature may appropriate from the general revenue an amount sufficient to replace the uninsured loss of any building or other permanent improvement; and

> (2) the legislature, *by two-thirds vote of each house,* may, *in cases of demonstrated need, which need must be clearly expressed in the body of the act,* appropriate general revenue funds for acquiring land with or without permanent improvements, for constructing or equipping buildings or other permanent improvements, or for major repair and rehabilitation of buildings or other permanent improvements.

*Id.* (emphasis added). Subsection (i)(1) permits the legislature to appropriate general revenue funds to replace the uninsured loss of a building or other permanent improvement. Subsection (i)(2) permits an appropriation of general revenue funds for more general purposes only if the legislature satisfies two special requirements: Each house must pass the appropriation by a two-thirds majority vote, and the legislature must include in the act of appropriation an express statement of need. The purpose of section 18(i)(2) may have been to separate these extraordinary appropriations from general appropriations acts, which are not subject to the same requirements.

Because the museum project is a permanent improvement eligible for financing under subsection (b), it is within the subsection (i) limitation on legislative appropriations. It has not been suggested that the museum building falls within the first exception to subsection (i) for replacing an uninsured loss due to fire or natural disaster. Thus, we must consider only whether the appropriation falls within the second exception.

Your query suggests that the museum building appropriation does not satisfy the subsection (i)(2) exception to the subsection (i) limitation on appropriations of general revenue funds because House Bill 1, which passed the Senate on a voice vote, does not satisfy the two-thirds vote requirement and because the appropriation did not contain "an expression of demonstrated need." Letter from Honorable Russell W. Malm, Midland County Attorney, to Honorable John Cornyn, Texas Attorney General, at 2 (Sept. 23, 1999) (on file with Opinion Committee) [hereinafter "Request Letter"]. We discuss the two-thirds vote and need requirements separately.

The subsection (i)(2) exception requires a two-thirds vote of each house. The University of Texas System has provided the following factual information:

> [T]he House Journal of May 26, 1999, reports that the House passed the General Appropriations Act on that day by a vote of 142 yeas, 1 nay and 2 present and not voting. The Senate Journal of May 27, 1999, reports that the General Appropriations Act was adopted by a viva voce vote, with Senator Barrientos asking to be recorded as voting "nay."

UT General Counsel Memo at 8. Thus, the concern is whether the voice vote in the Senate satisfies the subsection (i)(2) two-thirds vote requirement.

Courts in this state are loath to invalidate legislative enactments on the basis that the legislature failed to enact them according to constitutionally-mandated procedures. This reluctance manifests itself in the enrolled bill rule. "The enrolled bill rule has been repeatedly stated to be that a duly authenticated, approved, and enrolled statute imports absolute verity and is conclusive that an act was passed in every respect according to constitutional requirements." *Beckendorff v. Harris-Galveston Coastal Subsidence Dist.*, 558 S.W.2d 75, 78 (Tex. Civ. App.–Houston [14th Dist.] 1977), *writ ref'd n.r.e. per curiam*, 563 S.W.2d 239, 240 (Tex. 1978) (citing *Jackson v. Walker*, 49 S.W.2d 693 (1932); *Ellison v. Texas Liquor Control Bd.*, 154 S.W.2d 322 (Tex. Civ. App.–Galveston 1941, writ ref'd)). As the Texas Supreme Court has explained, under the rule, "the 'enrolled statute,' as authenticated by the presiding officers of each house . . . is precisely the same as and a 'conclusive record' of the statute that was enacted by the legislators. Under the strict enrolled bill rule, the House and Senate Journals are not more reliable records of what occurred than the enrolled bill, and no extrinsic evidence may be considered to contradict the enrolled version of the bill." *Association of Tex. Prof'l Educators v. Kirby*, 788 S.W.2d 827, 829 (Tex. 1990) (citations omitted). Although the Texas Supreme Court recently recognized a narrow exception to the rule "to avoid elevating clerical error over constitutional law," *id.* at 830, the court does not appear to have abandoned the version of the rule that generally treats the enrolled bill as conclusive evidence of an enactment's validity in favor of the more modern version of the rule that accords to the enrolled bill a prima facie presumption of validity but permits attack by certain extrinsic evidence, *see id.* at 829-30.

The enrolled bill rule is essentially evidentiary in nature, precluding the courts from scrutinizing extrinsic evidence to impeach the validity of a legislative enactment authenticated by officers of a co-equal branch of government. *See id.; see also Williams v. Taylor,* 19 S.W. 156, 157 (Tex. 1892) (stating that courts "should ponder well before undertaking to revise the proceedings of either house of the legislature, and to declare its action void merely on account of its failure to observe some rule of procedure prescribed in the constitution" and holding that constitution does not repeal common-law enrolled bill rule). Thus, the rule has been applied to reject constitutional challenges to legislation that would require the court to examine extrinsic evidence regarding the legislative process, such as allegations that the legislature failed to report a bill out of committee within three days of adjournment as required by article III, section 32, *see Williams v. Taylor,* 19 S.W. at 156-57; that the legislature failed to provide constitutionally required notice of proposed legislation, *see, e.g., Beckendorff,* 558 S.W.2d at 78 (applying enrolled bill rule to reject challenge that legislature failed to provide copies of legislation creating conservation district as required by article XVI, section 59(e)); *Moore v. Edna Hosp. Dist.,* 449 S.W.2d 508, 514-15 (Tex. Civ. App.–Corpus Christi 1969, writ ref'd n.r.e.) (applying enrolled bill rule to reject challenge that legislature failed to provide sufficient notice of legislation creating hospital district as required by article IX, section 9); or that a bill was not within the governor's special session call, *see City of Houston v. Allred,* 71 S.W.2d 251 (Tex. 1934); *Jackson v. Walker,* 49 S.W.2d 693 (Tex. 1932). On the other hand, the rule has not been applied to constitutional challenges to legislative action that may be assessed from the face of an enrolled bill, such as the contention that a bill violates the unity in subject requirement, *see* TEX. CONST. art. III, § 35(a) ("No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject."); *Jessen Assocs. v. Bullock,* 531 S.W.2d 593 (Tex. 1975) (addressing merits of claim that bill addressed more than one subject), or lacks the signature of the presiding officer of either house, *see* TEX. CONST. art. III, § 38; *Ex parte Winslow,* 164 S.W.2d 682, 684 (Tex. Crim. App. 1942); *Holman v. Pabst,* 27 S.W.2d 340 (Tex. Civ. App.–Galveston 1930, writ ref'd) (invalidating statute that lacked signature of Speaker of the House of Representatives).

It is a close question whether a court would apply the enrolled bill rule to conclude that the authentication of House Bill 1 by the presiding officer of the Senate is conclusive evidence that the appropriation at issue passed the Senate by the two-thirds vote required by section 18(i)(2) of article VII. We have found no judicial or attorney general opinion construing the section 18(i)(2) voting requirement. Courts in the past have looked to legislative journals to determine if a bill enacted with an emergency clause received a two-thirds vote for immediate effect as required by section 39 of article III. *See, e.g., Missouri, K. & T. Ry. Co. v. McGlamory,* 41 S.W. 466 (Tex. 1897). Examining the journals to determine whether a bill has carried a sufficient majority to be put into immediate effect is distinguishable, however, because in the case of the section 39 supermajority requirement the evidence in the journals affects only the bill's effective date and has no implications for the ultimate validity of the bill. *See Williams v. Taylor,* 19 S.W. at 158 (noting in dicta that it was appropriate for court in another case to look to journals to determine effective date of a bill because "the question was not whether the bill had passed, but whether it had been carried by a sufficient

majority to put it into immediate effect. The signatures of the presiding officer . . . attested the passage of the act, but did not determine that it had taken effect from the date of its passage. There being no method of attesting the fact that a bill which purports to take effect from its passage has received the required two-thirds majority, we deemed the journals the best evidence upon the question, and looked to them for that purpose only"). Furthermore, unlike section 39 of article III, section 18(i)(2) does not expressly require that the two-thirds vote be recorded in the House and Senate journals. *Compare* TEX. CONST. art. VII, § 18(i)(2) ("by two-thirds vote of each house"), *with id.* art. III, § 39 (bill may take effect immediately on vote of two-thirds of each house, "said vote to be taken by yeas and nays, and entered upon the journals"); *see also id.* art. III, § 32 (three readings requirement may be suspended by four-fifths vote "the yeas and nays being taken on the question of suspension, and entered upon the journals"), art. VII, § 5(b) (providing that bonds may exceed limitation if "authorized by a two-thirds record vote of both houses of the legislature"), art. IX, § 1 (authorizing creation of counties "by a two-thirds vote of each House of the Legislature, taken by yeas and nays and entered on the journals").

We are not aware of any Texas case addressing the enrolled bill rule's application to a similar supermajority voting requirement. The case law in other enrolled-bill-rule jurisdictions is not conclusive. *See generally* 1 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 14.04 (5th ed. 1994) ("In many states the conclusive presumption rule bars court attack on a statute which failed to meet a special voting requirement on passage. Some states which follow that rule have recognized an exception to it in the case of constitutionally mandatory voting requirements."). Moreover, the circumstances here are particularly unusual because the supermajority vote requirement at issue applies to a small item in a larger bill that is not subject to the supermajority vote requirement.

We believe there is an argument for applying the enrolled bill rule to the article 18(i)(2) voting requirement and for treating the authentication of House Bill 1 by the presiding officer of the Senate as conclusive evidence that the appropriation at issue passed the Senate by the required two-thirds vote. If this presumption of validity were applied, neither a court nor this office would look behind the authenticated statute to scrutinize the legislative record, such as the Senate Journal, to determine whether the legislature did in fact enact the appropriation according to constitutional requirements. However, as we explain below, this office finds no basis on which to defer to the legislature with respect to the section 18(i)(2) express need requirement.

Section 18(i)(2) also requires the museum building appropriation to satisfy a "need" requirement. Again, to fall within the subsection (i)(2) exception to the subsection (i) limitation on appropriations, the museum building appropriation must satisfy not only the two-thirds vote requirement, but must also be made in a case "of demonstrated need, which need must be clearly expressed in the body of the act." TEX. CONST. art. VII, § 18(i)(2). We construe this language to require that the institution of higher education seeking an extraordinary appropriation demonstrate to the legislature a need for the appropriation and the legislature clearly express that need in the body of the act.

While we believe that a court could apply the enrolled bill rule to reject a challenge to the appropriation based on the two-thirds vote requirement, we do not think that a court would apply the rule to reject a challenge based on the need requirement. As the case law indicates, the enrolled bill rule restrains a court from looking at extrinsic evidence to determine a statute's validity. *See* cases cited *supra* pp. 5-6. A court would not question the legislature's factual assessment that the need for an extraordinary appropriation has been demonstrated, an inquiry that would require the examination of extrinsic evidence. However, a court need not look to extrinsic evidence to determine whether the legislature has satisfied the requirement that the need for the appropriation must be "clearly expressed in the body of the act." TEX. CONST. art. VII, § 18(i)(2).

It has been suggested that the fact that the legislature appropriated funds to UTPB to construct the museum building indicates that the legislature determined that the appropriation was necessary. Although this must be the case, we do not believe that the mere fact of appropriation may satisfy the constitutional requirement. The constitution requires that the act of appropriation contain an express statement of need. The only statement in the Appropriations Act regarding the museum building appropriation is the rider to the UTPB appropriation: "Funds appropriated above for the Presidential Museum are for the purpose of constructing a building to house the Presidential Museum on a leased portion of the University of Texas of the Permian Basin campus. Funding for operations of the museum shall remain the responsibility of the Permian Basin Museum Board." Act of May 26,1999, 76th Leg., R.S., ch. 1589, III-79, 1999 Tex. Sess. Law Serv. 5446, 5747. Neither the rider or any other provision in the Appropriations Act addresses the need for the UTPB museum building appropriation. Given the complete absence of any statement regarding the need for the appropriation, we believe a court would have no choice but to conclude that the appropriation does not satisfy the section 18(i)(2) exception allowing an appropriation of general revenue for a demonstrated need that is "clearly expressed in the body of the act."

Had the legislature provided any statement regarding the need for the appropriation in the act, neither a court nor this office would look behind it. *See, e.g., Day Land & Cattle Co. v. State*, 4 S.W. 865, 873 (Tex. 1887) (legislature is sole judge of whether emergency exists to justify immediate passage of a bill and its finding cannot be questioned by a court). However, we cannot conclude that an appropriation of general revenue funds to an institution of higher education — an appropriation for a project eligible for financing under article VII, section 18(b) — that contains absolutely no expression of need satisfies the subsection (i)(2) exception to the general subsection (i) limitation on general revenue appropriations. Accordingly, we must conclude that the appropriation does not fall within the subsection (i)(2) exception and is precluded by subsection (i).

Given our conclusion, we do not address the authority of a state institution of higher education to construct a museum building to lease to a private entity or the legal standard for any lease arrangement. *See* Request Letter at 1 ("If the appropriation is valid and the university constructs the building, what legal standard applies to determining the amount of rent the presidential museum must pay to UTPB for the lease of the building?").

## S U M M A R Y

The University of Texas System component institutions and other institutions listed in article VII, section 18 of the Texas Constitution may not receive any funds from the general revenue of the state for construction of permanent improvements. *See* TEX. CONST. art. VII, § 18(a), (b), (i). However, the legislature may appropriate general revenue funds for this purpose if it does so "by two-thirds vote of each house [], in cases of demonstrated need, which need must be clearly expressed in the body of the act." *Id.* § 18(i)(2). Because the act appropriating general revenue funds for the construction of a museum building on the campus of The University of Texas of the Permian Basin does not express a need for the project, the appropriation is precluded by the article VII, section 18(i) limitation on appropriations.

Yours very truly,

JOHN CORNYN
Attorney General of Texas


ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General - Opinion Committee